Entered: September 30th, 2020



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   16-24661 TJC |
| Essex Construction, LLC | * | Chapter   11 |
| Debtor | * | |
| *   *   *   *   *   *   *   * | * | |
| Bradford F. Englander | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  18-00406 |
| Roger Blunt, Sr., *et al.* | * | |
| Defendants | * | |
| *   *   *   *   *   *   *   *   *   *   *   *   * | | |

### MEMORANDUM OF DECISION

Bradford F. Englander, the Chapter 11 Trustee (the "Trustee") of the estate of Essex

Construction, LLC, ("Debtor), brings this multiple count complaint against remaining defendants

General Roger R. Blunt ("General Blunt"), Vivian W. Bowers ("Ms. Bowers"), Victoria

Westbury ("Mrs. Westbury") and Eric Westbury ("Mr. Westbury")(collectively the

"Defendants")[1].  The Trustee seeks avoidance of transfers to or for the benefit of the Defendants

---

[1] The Complaint named other defendants; but all claims against defendants not otherwise named herein are resolved. The court has entered final judgments against Vertical Placement Solutions, LLC, Essex Holdings, Inc. and A. Hugo Bowers. ECF 57, 58, 109.

1

pursuant to 11 U.S.C. §§ 547 and 549[2] and recovery of the value of the transfers under §550.  He also seeks to avoid transfers to General Blunt under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Ann., Comm. Law, §§ 15–201, et. seq.  Finally, the Trustee brings claims for violation of the automatic stay, breach of fiduciary duty, common law claims of conversion, and civil conspiracy.[3]

The Defendants have participated in this proceeding without assistance of counsel.  They have each answered the Complaint, denying all allegations therein.  ECF 20, 21, 50, 53.  The court conducted a three-day trial spread over the period between September 25, 2019 and November 18, 2019.  The delay was the result of the court granting numerous requests by the defendants for continuances to seek counsel, or for health reasons.  ECF 92, 96, 97, 100, 102, 104, 105.  The trial has been concluded and the matter is ripe for resolution.

## Jurisdiction

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157(a), 1334 and United States District Court Local Rule 402.  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.  This adversary raises statutorily core claims pursuant to 28 U.S.C. §157(b)(2)(A), (E), (F), (H) and (O).  General Blunt and Ms. Bowers admit that these are core proceedings, ECF 25, 28, and have consented to the court's authority to finally resolve these claims.  *See*, *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 66 (2015).  Moreover, the claims brought under §547, §549 and §362 are claims arising under the Bankruptcy Code and are core proceedings over which this court has authority to enter final orders.

---

[2] Unless otherwise noted, all statutory references refer to Title 11 of the United States Code.

[3] Mr. Westbury has filed a Chapter 7 bankruptcy petition, Case No. 19-11874, and therefore the claims against him are stayed.  The court will not address the counts brought solely against Mr. Westbury, Counts VI and VII.

**Findings of Fact**

1.      The Debtor is a Maryland limited liability company that provided contractor and subcontractor services for construction projects.  It filed a voluntary Chapter 11 petition on November 4, 2016 (the "Petition Date").  ECF 1, Case No. 16-24661.

2.      At all times relevant herein, General Blunt was the Chairman of the Debtor.  He owned 51% of the Debtor from May 2013 until October 30, 2016 and owned at least 80% of the Debtor from October 31, 2016 forward.  General Blunt signed the Corporate Resolution filed with the court authorizing the bankruptcy filing.  ECF 2, Case No. 16-24661.

3.      Beginning in 2010, General Blunt's son, Jonathan Blunt, was made President of the Debtor.  General Blunt continued to be the Chairman.  Jonathan ceased serving as President and transferred his stock to General Blunt pursuant to a Separation Agreement dated October 30, 2016.  During the time Jonathan was President, General Blunt continued to sign checks and "was retiring" according to the testimony he gave at a Rule 2004 Examination.  Plaintiff's Exhibit ("PX") 137.

4.      Ms. Bowers, General Blunt's wife, acted as the treasurer/secretary of the Debtor.  General Blunt and Ms. Bowers were two of the three signatories on the Debtor's accounts leading up to, and after, the Petition Date until the Trustee was appointed.

5.      Ms. Bowers owned and controlled the entity Vertical Placement Solutions, LLC ("VPS"), a business engaged in executive recruitment and placement.  General Blunt was the Chairman of VPS beginning in October 2016.

6.      Mr. Westbury served as a consultant to General Blunt on matters concerning the Debtor and its business operations.  He was ordered off the Debtor's premises by Order of this Court entered on March 10, 2017.  *See,* ECF 261, Case No. 16-24661.  The Debtor affirmatively

3

stated in case filings that, post-petition, Mr. Westbury was General Blunt's personal assistant and did not work for the Debtor. ECF 248, ¶36. After being ordered not to visit the Debtor's offices, Mr. Westbury continued to serve as a personal consultant to General Blunt. Mrs. Westbury is the spouse of Mr. Westbury. She did not work for the Debtor during the relevant period of this action.

7.     Prior to filing the petition, the Debtor maintained bank accounts at M&T Bank and Industrial Bank. At M&T Bank, the Debtor maintained an operating account ("M&T OP Acct.") and a payroll account ("M&T PR Acct."). At Industrial Bank, the Debtor maintained an operating account ("Industrial OP Acct.").

8.     After filing, the Debtor opened and maintained two debtor-in-possession bank accounts at M&T Bank, an operating account ("M&T DIP OP Acct.") and a payroll account ("M&T DIP PR Acct.").

9.     After the Petition Date, the Debtor filed an Emergency Motion for Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. §§105 and 363, Emergency Motion for Authority to Use Pre-Petition Bank Accounts Pursuant to 11 U.S.C. §105, and an Emergency Motion to Pay Pre-Petition Wages Pursuant to 11 U.S.C. §§105 and 363. ECF 6, 10, 17, Case No. 16-24661.

10.    A series of Cash Collateral Orders followed, each allowing for payment of specific expenses identified in a budget attached as an exhibit thereto, among other terms[4].

---

[4] See, November 8, 2016 a Consent Order Authorizing Debtor's Interim Use of Cash Collateral (hereinafter "Interim Cash Collateral Order") for the period of November 8, 2016 through November 10, 2016. ECF 22, Case No. 16-24661. November 10, 2016 Second Consent Order Authorizing Debtor's Interim Use of Cash Collateral (hereinafter "Second Interim Cash Collateral Order") for the period of November 10, 2016 through December 2, 2016. ECF 29, Case No. 16-24661. November 23, 2016 a Consent Order Authorizing Debtor's Interim Use of Cash Collateral (hereinafter "Third Interim Cash Collateral Order"); superseding all previous orders related to cash

11.     On December 5, 2016, the United States Trustee (the "UST") filed a Motion to Appoint Chapter 11 Trustee or, in the alternative, to Convert Case to Chapter 7.  ECF 70, Case No. 16-24661.  The UST alleged the Debtor had transferred to General Blunt, then President of the Debtor, in excess of $300,000 in the ninety days before the petition.  *Id* at 4.  The UST argued a trustee was necessary to investigate and recover, if appropriate, the transfers because General Blunt had a conflict of interest and would not investigate himself.  *Id.*

12.     By March 2017 the parties were embroiled in litigation that involved, among other things, Rule 2004 examinations, motions for adequate protection and oppositions, objections to debtor's professional fees and a request by the Internal Revenue Service to suspend the interim cash collateral orders and to direct the debtor to segregate and/or turnover funds. Ultimately, however, the Debtor consented to the appointment of a Chapter 11 Trustee.

13.     Bradford F. Englander thereafter was appointed Trustee by order dated March 21, 2017.  ECF 288, Case No. 16-24661.  He brought this adversary proceeding action on October 27, 2018.

14.     During the period from November 13, 2013 until the Petition Date, Debtor transferred substantial amounts to General Blunt.  The Trustee assessed the transfers and seeks to recover $456,227.00 from General Blunt for transfers made from the M&T PR Acct., including a $125,000.00 wire transfer on October 20, 2016, only two weeks prior to the instant bankruptcy

---

collateral.  ECF 64, Case No. 16-24661.  The Third Interim Cash Collateral Order was extended through January 25, 2017, (hereinafter "Fourth Interim Cash Collateral Order").  ECF 77, 124, Case No. 16-24661.  A Fifth Consent Order Further Authorizing Debtor's Interim use of Cash Collateral was entered January 26, 2017 (hereinafter "Fifth Interim Cash Collateral Order").  ECF 138, Case No. 16-24661.  A Sixth Consent Order Further Authorizing Debtor's Interim Use of Cash Collateral was entered March 3, 2017 (hereinafter "Sixth Interim Cash Collateral Order").  ECF 235, Case No. 16-24661.

filing[5].  The Trustee also seeks to recover from General Blunt transfers from the M&T OP Acct., totaling $61,111.71, and from the Industrial OP Acct. totaling $22,600.00 (collectively, the "Blunt 3-year Transfers").  PX 139.

15.     Prior to filing the petition, on or about May 19, 2013, the Debtor entered into an Office Lease Agreement with Jemal's Ikon, LLC, as landlord, for premises located in Oxon Hill, Maryland (the "Oxon Hill Lease").  General Blunt guaranteed the Debtor's obligations under the Oxon Hill Lease.  On or about January 22, 2014, the Debtor entered into an Office Lease Agreement with Jemal's Mellwood, LLC (together with Jemal's Ikon, LLC, the "Jemal Parties"), as landlord, for premises located in Upper Marlboro, Maryland (the "Mellwood Lease").

16.     The Debtor breached the Oxon Hill Lease and the Mellwood Lease.  As a result, on January 26, 2015, the Jemal Parties filed suits against the Debtor in Prince George's County Circuit Court for unpaid rent.  In June 2016, to resolve the litigation, the Debtor and the Jemal Parties entered into a Settlement Agreement (the "Jemal Settlement").

17.     The Jemal Settlement obligated the Debtor to pay $525,000.00 in seventy-two installments of $7,29167, commencing April 15, 2016.  General Blunt, along with his son, Jonathan Blunt, personally guaranteed the Debtor's obligations under the Settlement Agreement. As additional consideration, the Debtor, General Blunt and Jonathan Blunt consented to judgment in favor of the Jemal Parties.

18.     As contemplated by the Jemal Settlement, on June 10, 2016, two consent judgments were entered in state court, one in the principal amount of $561,681.80 against the

---

[5] This transfer was authorized by General Blunt himself according to the testimony given by him at the Debtor's Meeting of Creditors.  PX 132.

Debtor in favor of Jemal's Ikon, LLC, and the other in the principal amount of $99,204.20 against the Debtor in favor of Jemal's Mellwood, LLC.

19.     Under the Jemal Settlement, Debtor paid $51,060.71 pre-petition (the "Jemal's Pre-Petition Transfers), and $29,796.68 post-petition (the "Jemal's Post-Petition Transfers").

20.     On September 30, 2016, the Debtor submitted a Bid/Performance Bond Request to Talisman Casualty and/or Talisman SV ("Talisman"), requesting immediate issuance of a payment and performance bond in the amount of $655,000.  The Debtor requested the bonding program to support work orders under a Master Agreement for work to be performed for Corvias Prince George's County Stormwater Partners, LLC.  The requested bond related to a statement of work under the Master Agreement for the Potomac Business Park Pond project.

21.     To obtain the bond, the Debtor paid $79,729 to Talisman on October 26, 2016 -- $19,729 as a premium and $60,000 as collateral.

22.     Following the Petition Date, Talisman learned of the Debtor's bankruptcy case and determined it would not issue the bond.  In an email message to Mr. Westbury on December 6, 2016, Talisman asked for the Debtor's "bank account and routing #, so we can start the process of returning monies."  PX 99.

23.     Mr. Westbury, acting as assistant to General Blunt and in conjunction with Ms. Bowers, sent an email to Talisman instructing that the funds should be wire-transferred to the bank account of Essex Holdings, Inc. ("Holdings").  PX 4.  Holdings had been recently formed, and Ms. Bowers and/or General Blunt were owners.  The Holdings' bank account had been recently opened by Ms. Bowers, who was identified as "Key Executive with Control of the Entity."  PX 123 at p 3.

7

24.     On December 13, 2016, Talisman transferred $2,413.00 to the Holdings' account and on December 14, 2016, transferred $74,816.00 to the Holdings' account, for a total of $77,229 (the "Talisman Transfers").  PX 124 at p. 10.  The Talisman Transfers to Holdings were intended by Ms. Bowers and Mr. Westbury to divert the funds from the Debtor.

25.     On October 1, 2016 the Debtor entered into a Recruiting and Management Consulting Agreement (the "Recruiting  Agreement") with VPS.  The Recruiting Agreement was not disclosed in the Debtor's bankruptcy  schedules nor did the Debtor seek or obtain court authority to assume the Recruiting Agreement or to use property of the estate to make payments under the Recruiting Agreement.

26.     The Debtor made the following five post-petition payments to VPS (the "VPS Transfers"):

| Issue Date | Cleared Date | Payee | Account | Check /ACH # | Amount |
|---|---|---|---|---|---|
| 11/17/16 | 11/17/16 | VPS | M&T DIP Op Acct | Book Transfer | $2,500.00 |
| 11/18/16 | 11/18/16 | VPS | M&T DIP Op Acct | Wire Transfer | $28,000.00 |
| 1/18/17 | 1/18/17 | VPS | M&T DIP Op Acct | Wire Transfer | $25,000.00 |
| 2/9/17 | 2/13/17 | VPS | M&T DIP Op Acct | Check #3078 | $14,400.00 |
| 2/24/17 | 2/24/17 | VPS | M&T DIP Op Acct | Wire Transfer | $12,600.00 |
|  |  |  |  |  | **$82,500.00** |

27.     The VPS Transfers were not authorized by the court or allowed by the cash collateral orders.

28.     Additional findings of fact will be made below as appropriate.

**Conclusions of Law**

The Trustee seeks the following:

- The Blunt 3-year Transfers:  Avoidance and recovery of $538,940.60 of the pre-petition fraudulent transfers made to General Blunt in the three years preceding the bankruptcy petition, pursuant to §§544 and 550.

- The VPS Transfers:  The Trustee seeks recovery of the value of those transfers from General Blunt, Ms. Bowers and Mrs. Westbury, pursuant to §550. As discussed further below, this court previously avoided the VPS Transfers as to VPS under §549.

- The Talisman Transfers:  The Trustee seeks recovery of the value of the Talisman Transfers from Ms. Bowers and General Blunt under §550. As discussed further below, this court previously avoided the Talisman Transfers as to Holdings under §549.

- The Jemal's Pre-Petition Transfers:  Avoidance under §547 of $51,060.71 in pre-petition preferential transfers made to the Jemal Parties, and recovery of the transfers from General Blunt under §550.

- The Jemal's Post-Petition Transfers:  Avoidance under §549 of $29,796.68 in unauthorized post-petition transfers by the debtor to the Jemal Parties, and recovery from General Blunt under §550.

- The Mrs. Westbury Transfers:  Recovery from Mrs. Westbury of $10,550.02 under §550(a)(2), as the immediate transferee of unauthorized post-petition transfers.

- Punitive damages for alleged violations of the automatic stay, civil conspiracy and breach of fiduciary duty.

Before turning to these specific claims, the court will address whether the Debtor was insolvent during the avoidance period.

**The Debtor's Insolvency**

9

The term "insolvent" is defined by the Bankruptcy Code, as pertinent here, as follows:

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of--
> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
> (ii) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. §101(32).

The Trustee retained Mr. Louis B. Ruebelmann, an accountant with more than 40 years of experience, who was qualified as an expert in assessing the solvency of the Debtor. He considered whether the Debtor was solvent during the five-year period beginning December 31, 2012. Mr. Ruebelmann considered the fair valuation of the Debtor's assets and liabilities, and concluded the Debtor was insolvent throughout the period December 31, 2012 through December 31, 2016, as follows:

| | 12/31/12 | 12/31/13 | 12/31/14 | 12/31/15 | 12/31/16 |
|---|---|---|---|---|---|
| **Amount of Insolvency** | ($1,566,567) | ($1,577,698) | ($7,120,226) | ($6,671,181) | ($7,356,303) |

Mr. Ruebelmann was a well-informed, credible witness and has been appointed an expert in accounting, forensic accounting and/or insolvency analysis in bankruptcy courts more than 30 times. Based on his analysis, as well as other evidence introduced at trial, the court concludes that the Debtor was insolvent at all relevant times to this adversary proceeding.

In reaching his conclusion, Mr. Ruebelmann reviewed many accounting and other records and documents, which are listed in the exhibits. He began his analysis by noting that the Debtor's financial statements, particularly its balance sheet, showed the Debtor was insolvent

during the period based on the historic cost basis reflected in those statements. He then adjusted the assets and liabilities based on a fair valuation analysis.

The fair valuation adjustments Mr. Ruebelmann made to the Debtor's assets had the effect of reducing the value of the assets, rather than increasing them, thus further deepening the Debtor's insolvency from that shown on the financial statements. For example, at December 31, 2014, the Debtor carried approximately $1.1 million in its "contract retention" account for a particular Washington D.C. contract. The Debtor's accountants wrote-off that retention account in 2015, and stated the write-off was a prior period adjustment. Accordingly, Mr. Ruebelmann eliminated the retention amount in 2014. He also made some adjustments for unbilled receivables and other receivables for which there was no support, but these amounts were not particularly material.

The adjustments that Mr. Ruebelmann made to the Debtor's liabilities did not have the effect of altering his conclusions that the Debtor was insolvent during the period. He reclassified some related party loans as members' equity because he did not find any support that the amounts should be classified as loans — he found no entries in the bank statements that any deposits were even made to support the contributions, whether classified as loans or equity. He classified the amounts as equity, rather than eliminating them altogether, to take a conservative approach to the analysis. By including them as equity, these adjustments had the effect of rendering the Debtor less insolvent because they reduced the amount of liabilities and increased its equity. The adjustment, however, did not result in the Debtor being solvent.

Two additional liabilities need to be addressed. An affiliate of the Debtor, Essex Real Estate Holdings, Inc. ("Essex Real Estate"), acquired two condominiums in Rockville, Maryland in April 2014 by borrowing $1.26 million and $3.24 million from Firsttrust Bank. Claim No. 13-

1, pages 4-5, in Case No. 16-24661.  The Debtor was a co-maker on the loans.[6]  *Id.*  Mr. Ruebelmann testified that the liabilities needed to be included in the insolvency analysis because the Debtor was a primary obligor, not merely a guarantor, on the loans.  He further testified that the value of the condominiums should not be included in the fair valuation of the Debtor's assets because the Debtor did not own them.  The definition of "solvent" focuses on whether "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." §101(32).  Because the condominiums were not "such entity's property" he excluded their value from the analysis.

Even if the court were to consider the value of the condominiums owned by Essex Real Estate in the analysis, the conclusion that the Debtor was insolvent during this period would not change.  Mr. Ruebelmann testified that the loans were in default as soon as they were made.  Indeed, in July 2015, the Montgomery County Circuit Court entered judgments on the loans against the Debtor, Essex Real Estate, General Blunt and others in the amounts of $1.3 million and $3.4 million.  *Id* at 5-6.  The condominiums were sold at foreclosure in March 2016 for an aggregate price of approximately $1.1 million.  After the foreclosure, the Debtor remained obligated on a $3.7 million deficiency claim.  Thus, it is apparent that the value of the Essex Real Estate's condominiums was well below the amount of the debt against it owed by the Debtor, and including the value of the real estate would not change the conclusion that the Debtor was insolvent.

Further, the evidence established that the Debtor was unable to pay its obligations during the period of Mr. Ruebelmann's analysis.  For example, the IRS filed a proof of claim in excess

---

[6] General Blunt guaranteed the loans.  The facts concerning the Firsttrust loans were established during the bankruptcy case and not controversial.  *See e.g.*, Adv Proc. 17-00156.

of $3 million dating back to 2012.  Claim 1-5.  The substantial portion of the claim is for unpaid

withholding taxes, and the unpaid taxes increased in amount each year from 2012 through 2016.

*Id*. at p. 4 of 5.  In addition, as stated above, Firsttrust Bank obtained judgments against the

Debtor in July 2015 for $4.7 million.  Further, the Debtor defaulted on both the Oxon Hill Lease

and the Mellwood Lease prior to January 2015, when it was sued for unpaid rent under the

leases.  The Debtor owed in excess of $650,000 of back rent in 2016.  Indeed, Mr. Ruebelmann

opined that the Debtor essentially funded its operations during this period by failing to pay

withholding taxes and other obligations.

The test for solvency under §101(32) is based on a fair valuation of a debtor's assets and

liabilities, rather than whether a debtor is paying its obligations as they come due.  Nevertheless,

the inability of the Debtor to pay its withholding taxes, rent and other obligations provides

additional support for the conclusion that the Debtor was insolvent during this period.

**General Blunt, Ms. Bowers and VPS are Insiders of the Debtor**

General Blunt, Ms. Bowers and VPS were statutory insiders of the debtor.  Section

101(31) of the Bankruptcy Code provides:

> The term "insider" includes—
>
> ******
> (B) if the debtor is a corporation--
> (i)  director of the debtor;
> (ii) officer of the debtor;
> (iii) person in control of the debtor;
> (iv) partnership in which the debtor is a general partner;
> (v) general partner of the debtor; or
> (vi) relative of a general partner, director, officer, or person in control of
> the debtor;

******
 (E) affiliate, or insider of an affiliate as if such affiliate were the debtor;

 11 U.S.C. §101(31)(B); (E).  An "affiliate" is defined as:

13

(2) The term "affiliate" means—

(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
    (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
    (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities--
    (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
    (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;
    ****

11 U.S.C. §101(2).

General Blunt was a statutory insider because he was an officer of the Debtor and because he owned well in excess of 20% of the Debtor's member interests. Ms. Bowers was an insider because she was an officer of the Debtor and because, under §101(31)(B)(vi), as General Blunt's wife, she was a relative of an officer and person in control of the Debtor. VPS was an affiliate of the Debtor within the meaning of §101(2).

**The Blunt 3-year Transfers**

In the three years prior to Debtor's bankruptcy filing, from November 13, 2013 through October 20, 2016, Debtor made numerous transfers to General Blunt. The Trustee seeks avoidance of $539,938.59 of the transfers pursuant to the Maryland Uniform Fraudulent Conveyance Act, Md. Code Ann., Comm. Law, §§ 15–201 through 214 (hereinafter,

"MUFCA"). The court concludes that the Trustee has established that $508,250.00 of the

transfers are avoidable under MUFCA and recoverable from General Blunt under §550[7].

MUFCA §15-207 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.

MUFCA §15-208(b)(1) provides:

(b) Every conveyance of limited liability company property and every limited liability company obligation incurred when the limited liability company is or will be rendered insolvent by it, is fraudulent as to creditors of the limited liability company, if the conveyance is made or the obligation is incurred to:

(1) A member, whether with or without a promise by him to pay the limited liability company's debts, unless the conveyance or obligation represents fair and reasonable compensation for services provided or to be provided by the member to the limited liability company and the services are provided or will be provided within 120 days before or after the date the conveyance is made or the obligation is incurred….

The Trustee can assert claims under MUFCA pursuant to §544(b) of the Bankruptcy Code,

which provides:

(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is **voidable under applicable law** by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title. (emphasis added).

11 U.S.C. §544(b).  Because the Trustee may proceed with an avoidance action under Maryland

law, the time frame for consideration of fraudulent transfers is expanded from two years under

---

[7] There is one transaction on April 10, 2014 from the M&T PR Acct. where a check was made out to "Cash" and endorsed by Kirk Saunders, in the amount of $31,688.59.  The Trustee asserts that the cash payment was paid to Maryland for estimated taxes but that the Debtor, as an LLC, would not have such an obligation and therefore it was a payment for the benefit of General Blunt.  The evidence does not support a finding that these funds were paid to or for the benefit of General Blunt.

§548(a)(1) of the Bankruptcy Code, to three years under Maryland law.  *See*, Md. Code Ann., Cts. & Jud. Proc. §5–101 (generally, a civil action must be filed within three years from when it accrues).

PX 139 lists the transfers on which the Trustee bases his claim, including the corresponding check numbers, bank accounts, and other information, that.  The Defendants do not dispute these transfers occurred, and, in any event, the Trustee submitted into evidence copies of the checks and other documents that establish that the Debtor made these transfers to General Blunt.  Other than the four transfers next described, the Debtor's controller verified that all of the transfers on PX 139 were recorded as "member distributions to Roger Blunt" in the Debtor's general ledger in the ordinary course of business.  Four transfers – two dated August 26, 2016 in the amounts of $9,000.00 and $37,000.00, and two on September 9, 2016, in the amounts of $23,575.96 and $10,000.00 – were originally recorded in the "miscellaneous account" of the general ledger.  *See*, PX 139 at p. 10-11.  The controller assessed these four transactions and concluded they were more properly recorded as member draws to General Blunt.[8]  Accordingly, the total amount of $508,250 was verified by the Debtor's controller to have been properly recorded as member draws to General Blunt.

MUFCA provides an exception for a conveyance made for "fair and reasonable compensation for services provided or to be provided by the member" to the limited liability company if "the services are provided or will be provided within 120 days before or after the date the conveyance is made…." §15-208(b).  At the Debtor's §341 meeting, however, General

---

[8] Ten transfers in the total amount of $51,060.71 listed on PX 139 are transfers to Jemal's Ikon. They are excluded from the category of transfers to General Blunt in this discussion, and are addressed in the discussion of the Jemals' transfers below.

Blunt testified that he was receiving monies from the Debtor as a "draw" and not as employment compensation. An excerpt from General Blunt's testimony is as follows:

> Ms. Kohen: And prepetition, before the bankruptcy filing –
>
> General Blunt: Yes.
>
> Ms. Kohen: -- what was your salary?
>
> General Blunt: I didn't have a salary at the time and I probably still don't, but I have a draw.
>
> Ms. Kohen: Okay. What was your draw?
>
> General Blunt: The draw was approximately, what is it, I have it in two ways. Number one, it's around – I'll say 20 80 dollars a year phonetic) and you multiply that out, it's about 215, maybe about 200,000 you have it in the records, so you have to tell me.
>
> Ms. Kohen: So it's about 200,000 a year?
>
> General Blunt: Well, no. Basically it is basically 215 or 196, or whatever that comes out. I don't have a salary, but the draw is for basically taking care of things that the company doesn't take care of.
>
> Ms. Kohen: Okay. So tell me the difference between a salary and a draw.
>
> General Blunt: Well, a draw is, I put over 2 million dollars in a company and quite frankly if you calculate that right, you know, I have a loan that's going to be reimbursed to me. You can call it a draw, it's a capital return. There's no tax on it.

PX 132. Thus, by General Blunt's own testimony, the payments were return of capital and not compensation for services rendered.

This testimony is consistent with the events occurring in the management of the Debtor's business. General Blunt's son, Jonathan Blunt, was made the President of the Debtor in 2010. General Blunt continued to be the Chairman of the Debtor. Jonathan ceased serving as President and transferred his stock to General Blunt pursuant to a Separation Agreement dated October 30, 2016, four days before the petition was filed. ECF 202. None of the avoidable transfers occurred

17

after October 30, 2016.  Aside from General Blunt's description of the transfers, there is no

support in the record that payments of $508,250 to him were "fair and reasonable

compensation," as required by MUFCA §15-208(b)(1), for serving as Chairman only, while

Jonathan served as President.

Defendants claim that at least some of the transfers to General Blunt were in repayment

of loans he made to the Debtor.  This claim is unavailing.[9]

MUFCA §15-203 provides:

> Fair consideration is given for property or an obligation, if:
> > (1) In exchange for the property or obligation, as a fair equivalent for it
> > and in good faith, property is conveyed or an antecedent debt is satisfied;
> > or
> > (2) The property or obligation is received in good faith to secure a present
> > advance or antecedent debt in an amount not disproportionately small as
> > compared to the value of the property or obligation obtained.

Defendants' contention fails for several reasons.  First, the evidence did not establish that

General Blunt was owed an antecedent debt from the Debtor.  General Blunt states only that he

was owed "loans" in the most generic sense.  He has produced no notes or documents evidencing

an obligation by the Debtor to repay him.  Defendants did not state terms of any loan obligation,

such as interest rate, repayment schedule, maturity date, or any other term that could lead to the

conclusion that the Debtor was indebted to General Blunt.  Defendants produced no checks, wire

transfers or bank statements showing that General Blunt transferred funds to the Debtor.  Further,

the Trustee is not aware of any documents supporting a loan from General Blunt to the Debtor.

Mr. Ruebelmann could find no support that the Debtor was indebted to General Blunt, and found

---

[9] Because the court concludes that the transfers to General Blunt were not in repayment of loans, the court need not address whether any of the transfers are avoidable preferences under §547.

no deposits or other support that General Blunt had made loans to the Debtor.  The Debtor's controller testified the transfers were not reimbursements or similar expenses.

The court concludes that, at best, General Blunt had made member contributions at some time in the past.  Any such amounts were capital contributions and not loans from General Blunt. The transfers to General Blunt were therefore, at best, return of capital contributions, just as General Blunt testified, and were not repayment of an "antecedent debt" within the meaning of MUFCA §15-203.

Further, even if, contrary to the above ruling, the transfers were in payment of an antecedent debt to General Blunt, the court would not conclude the transfers were made in good faith as required by MUFCA §15-203(1).  As stated above, during the time period that the transfers were made, the Debtor was not paying its withholding taxes each year, in increasingly greater amounts.  The IRS's claim exceeds $3 million.  Likewise, the Debtor was not paying other obligations.  The Jemal Parties sued the Debtor for unpaid back rent in excess of $650,000 in January 2015, and Firsttrust Bank obtained judgments against the Debtor for $4.7 million in July 2015.  As stated above, Mr. Ruebelmann convincingly opined that the Debtor was insolvent during this period and funded its operations by failing to pay withholding taxes and other obligations.  It is not good faith under MUFCA §15-203 for an LLC to make continual and substantial transfers to a member while suffering losses and failing to pay bona fide tax and creditor obligations.

The Debtor is a Maryland limited liability company.  General Blunt held an interest in the Debtor at all relevant times.  Testimony and evidence presented at trial established that transfers of $508,250 on PX 139 were a conveyance of LLC property to General Blunt made when the Debtor was insolvent, and are not otherwise excepted under MUFCA.  The Court finds that the

19

Debtor was not obligated to make these payments to General Blunt under either a loan repayment agreement, for fair and reasonable compensation, or for any other reason. Therefore, the payments were not for fair consideration as defined in MUFCA. The transfers constitute fraudulent transfers under Maryland law and are avoided accordingly.

The transfers to General Blunt became larger and larger in amount as the Petition Date neared, *see* PX 139, raising a serious question whether the transfers were made with "actual intent" to "hinder, delay or defraud" present or future creditors. MUFCA §15-207. Most notably, the Debtor transferred $125,000 to General Blunt on October 20, 2016, two weeks before the Petition Date. General Blunt testified early in the case that he authorized the transfer to be made. The court concludes this transfer meets the elements of MUFCA §15-207. It was a transfer for no consideration, authorized by an insider for payment to himself, made shortly before the filing of the petition, without any plausible justification.

Finally, the Trustee asserts that Ms. Bowers was the beneficiary of these transfers, and therefore the court should enter judgment against her under §550(a)(1). The evidence did not support this claim, as no evidence was introduced to establish what General Blunt did with the transfers. As a result, judgment will be entered against General Blunt in the amount of $508,250.00 pursuant to MUFCA §15-208(b)(1), including a judgment for $125,000 pursuant to MUFCA §15-207, and recoverable under §550.

**VPS Transfers**

After the Petition Date, the Debtor made the VPS Transfers, constituting five transfers totaling $82,500.00 to VPS. FF 26. The Trustee contends these transfers were unauthorized and avoidable under §549. He seeks to recover under §550, transfers in the amounts of $58,401.36 from Ms. Bowers, $28,635.03 from General Blunt, and $6,750.02 from Mrs. Westbury. For the

reasons that follow, the court will enter judgment against these defendants, but in somewhat different amounts.

Section 549 provides, in relevant part:

(a) Except as provided in subsection (b) or (c)[10] of this section, the trustee may avoid a transfer of property of the estate--
　　　　(1) that occurs after the commencement of the case; and
　　　　(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
　　　　　　(B) that is not authorized under this title or by the court.

The court is not writing on a clean slate on the avoidance of the VPS Transfers under §549. During the bankruptcy case, while the UST's motion for appointment of a Chapter 11 trustee was pending, creditor Firsttrust Bank filed an emergency motion to expedite the hearing on the motion for appointment. ECF 240, Case No. 16-24661. It argued essentially that the Debtor's insiders were draining the Debtor's cash resources by making unauthorized transfers to themselves. Firsttrust pointed to, among other things, payments from the Debtor to VPS as examples of the Debtor's improper activities.

In its response, the Debtor argued that post-petition payments to VPS were legitimate payments for employee placement service based on a pre-petition contract. Nevertheless, it admitted the payments to VPS were not authorized by the Court or the existing cash collateral orders. ECF 248 at p. 5, Case No. 16-24661. The Debtor stated that VPS "has agreed to refund the placement fees at issue to avoid any additional inquiry into the matter. And while such refunds do not negate the transfers themselves, they will make the Debtor whole." *Id.*

VPS did not refund the fees, thus necessitating the Trustee's action. The Trustee named VPS in the complaint and sought to avoid the transfers under §549. VPS failed to answer, and

---

[10] The exceptions in §549(b) and (c) do not apply to this case.

the Trustee moved for a default judgment.  The court entered final judgment against VPS,

avoiding the VPS Transfers and finding VPS liable to the estate "in the amount of $82,500, as

the initial transferee…"  ECF 58.  At the time, General Blunt, Ms. Bowers and Mrs. Westbury

were parties in this adversary proceeding.  Accordingly, the VPS Transfers have been avoided

under §549 as unauthorized post-petition transfers.[11]

The court turns to the question of whether the Trustee can recover the value of the VPS

Transfers from the Defendants pursuant to §550.  Section §550(a) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
> trustee may recover, for the benefit of the estate, the property transferred, or, if the
> court so orders, the value of such property, from--
>> (1) the initial transferee of such transfer or the entity for whose benefit
>> such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.

Section 550(a) allows the Trustee to recover for the benefit of the estate:

> …from the initial transferee "or" the entity for whose benefit the transfers were
> made "or" subsequent transferees.  As used in the Bankruptcy Code, "or" is not
> exclusive.  Thus, the trustee can recover from any combination of the entities
> mentioned above subject to the limitation of a single satisfaction.

5 Collier on Bankruptcy P 550.02[4] (16th 2020).

Section 550(b) provides defenses to certain transferees in a recovery action:

---

[11] Even if the Debtor had not previously admitted the VPS Transfers were unauthorized, and even if the transfers
had not previously been avoided by the court, the grounds for their avoidance under §549 are manifest. In the cash
collateral orders, the Debtor was under strict requirements that it could only pay certain expenses, and payments to
VPS were not included. In fact, the cash collateral orders specifically prohibited any payments to insiders, except as
expressly provided. VPS is a statutory insider of the Debtor, §§101(31)(E); (2)(B), and given the overlap in
ownership, officers, and control would be a non-statutory insider as well.  The contract between the Debtor and VPS
was not disclosed to the court or creditors, and was not included on the Debtor's original or amended schedule of
executory contracts.  ECF 71 at p. 19; ECF 82 at p. 17 in Case No. 16-24661.  The payments were purportedly for
the placement of four employees, two of whom never actually worked for the Debtor and one whom worked for four
days.  An insider's transactions with a debtor are subject to rigorous or strict scrutiny pursuant to *In re Harford
Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004), and the transfers cannot withstand that scrutiny.

(b)The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

In determining whether a transferee takes in "good faith" under §550(b)(2), courts look to what the transferee objectively "knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." *Goldman v. Capital City Mortgage Corp. (In re Nieves)*, 648 F.3d 232, 238 (4th Cir. 2011) (quoting *Gold v. Laines (In re Laines),* 352 B.R. 397, 406 (Bankr.E.D.Va.2005)).

The first VPS Transfer from the Debtor was on November 17, 2016 in the amount of $2,500. FF 26. A second post-petition transfer to VPS from the Debtor was on November 18, 2016, in the amount of $28,000. *Id.* After these transfers, Ms. Bowers made the following transactions totaling $18,351.36 from the VPS account:

| Date | Amount | Type of Transaction |
|------|--------|---------------------|
| 11/18/16 | $13,301.36 | Cash withdrawal by Ms. Bowers[12] |
| 11/18/16 | $2,000.00 | Cash withdrawal by Ms. Bowers |
| 11/18/16 | $600.00 | Transfer to Bowers WF Acct. x5790[13] |
| 11/23/16 | $1,200.00 | Transfer to Bowers WF Acct. x5790 |
| 11/25/16 | $650.00 | Transfer to Bowers WF Acct. x5790 |

---

[12] When questioned at trial, Ms. Bowers admitted that she was the party who took each of the cash withdrawals reflected in the charts herein. Additionally, when questioned, she had no recollection of the purpose for these withdrawals.

[13] As the evidence shows, Ms. Bowers maintained a series of personal bank accounts at Wells Fargo Bank. The accounts relevant to these proceedings are accounts ending in x5790, x5239 and x4295.

| | | |
|---|---|---|
| 11/28/16 | $600.00 | Transfer to Bowers WF Acct. x5790 |

The third VPS Transfer occurred on January 18, 2017 in the amount of $25,000.00.  *Id.*

Following this transfer, Ms. Bowers made the following transactions totaling $24,400, from the

VPS account:

| Date | Amount | Type of Transaction |
|---|---|---|
| 1/18/17 | $1,200.00 | Transfer to Bowers WF Acct. x5790 |
| 1/18/17 | $17,500.00 | Transfer to Bowers WF Acct. x5790 |
| 1/19/17 | $1,500.00 | Check #1041 to Mrs. Westbury |
| 1/24/17 | $100.00 | Transfer to Bowers WF Acct. x5790 |
| 1/25/17 | $100.00 | Transfer to Bowers WF Acct. x5239 |
| 1/26/17 | $150.00 | Transfer to Bowers WF Acct. x5790 |
| 1/26/17 | $100.00 | Transfer to Bowers WF Acct. x5239 |
| 1/26/17 | $100.00 | Transfer to Bowers WF Acct. x5239 |
| 1/27/17 | $1,000.00 | Transfer to Bowers WF Acct. x5239 |
| 1/27/17 | $400.00 | Transfer to Bowers WF Acct. x5790 |
| 1/30/17 | $1,700.00 | Cash withdrawal by Ms. Bowers |
| 1/30/17 | $125.00 | Transfer to Bowers WF Acct. x5790 |
| 1/31/17 | $425.00 | Transfer to Bowers WF Acct. x5790 |

The fourth VPS Transfer occurred on February 9, 2017 in the amount of $14,400.00.  *Id.*

Following this transfer, Ms. Bowers made the following transactions totaling $11,150 from the

VPS account:

| Date | Amount | Type of Transaction |
|---|---|---|
| 2/13/17 | $800.00 | Transfer to Bowers WF Acct. x5790 |

24

| 2/13/17 | $3,000.00 | Check #1052 to Mrs. Westbury |
| 2/13/17 | $1,700.00 | Transfer to Bowers WF Acct. x5790 |
| 2/13/17 | $350.00 | Transfer to Bowers WF Acct. x5239 |
| 2/13/17 | $500.00 | Transfer to Bowers WF Acct. x5790 |
| 2/13/17 | $3,650.00 | Cash withdrawals by Ms. Bowers |
| 2/14/17 | $550.00 | Cash withdrawal by Ms. Bowers |
| 2/15/17 | $300.00 | Transfer to Bowers WF Acct. x5790 |
| 2/21/16 | $300.00 | Transfer to Bowers WF Acct. x5790 |

The fifth VPS Transfer occurred on February 24, 2017 in the amount of $12,600.00.  *Id.*

Following this transfer Ms. Bowers made the following transactions, totaling $11,250.02, from

the VPS account:

| Date | Amount | Type of Transaction |
| --- | --- | --- |
| 2/24/17 | $7,700.00 | Transfer to Bowers WF x5790[14] |
| 2/24/17 | $1,500.00 | Check #1056 to Mrs. Westbury |
| 2/27/17 | $750.02 | Check #1057 to Mrs. Westbury |
| 2/28/17 | $250.00 | Transfer to Bowers WF Acct. x5790 |
| 3/1/17 | $100.00 | Transfer to Bowers WF Acct. x4295 |
| 3/3/17 | $150.00 | Transfer to Bowers WF Acct. x5790 |
| 3/3/17 | $100.00 | Transfer to Bowers WF Acct. x5790 |
| 3/6/17 | $200.00 | Cash withdrawal by Ms. Bowers |

[14] Immediately following this transfer, a subsequent transfer of $7,500.00 was made from the Bowers WF x5790 account to the Bowers WF #5239 account.

25

| | | |
|---|---|---|
| 3/6/17 | $500.00 | Transfer to Bowers WF Acct. x5239 |

VPS was the initial transferee of the VPS Transfers under §550(a)(1). *See,* ECF 58. Ms. Bowers was the mediate transferee under §550(a)(2) of the VPS Transfers for all cash withdrawals she made from the VPS account and for the transfers she made from the VPS account to her personal Wells Fargo accounts. At trial, Ms. Bowers was unable to explain what she did with these funds. There is no question she made the cash withdrawals and transferred the funds to her personal accounts, thereby exercising ownership and control over them. There were five cash withdrawals totaling $21,401.36, and 27 transfers to her personal accounts totaling $37,000.00, for a total of $58,401.36.

Ms. Bowers did not take the transfers in good faith, for value, and without knowledge of the voidability of the transfers, as provided in §550(b). As an insider of both the Debtor and VPS, she was on both sides of the VPS Transfers from the Debtor to VPS. She knew the Debtor was in bankruptcy and could only make payments pursuant to the cash collateral orders. She knew, or should have known, the VPS Transfers were not authorized, admitting at trial the transfers were made in order to pay obligations that she knew the court would not allow to be paid. As stated above, the Debtor itself admitted the VPS Transfers were unauthorized and VPS agreed to return the funds. Finally, because she could not recall what she did with the funds she received from VPS, she could not establish she took the funds for value. The court will enter judgment against Ms. Bowers for $58,401.36.

Ms. Bowers made four payments to Mrs. Westbury in the total amount of $6,750.02, from the VPS Transfers. Mrs. Westbury is a mediate transferee under §550(a)(2). Further, Mrs. Westbury did not take the transfers in good faith, for value, or without knowledge of the

voidability of the transfers, as provided in §550(b).  Ms. Bowers testified she paid Mrs. Westbury in order to compensate Mr. Westbury, Mrs. Westbury's husband, for services he performed as a consultant to General Blunt.  Ms. Bowers admitted she knew the bankruptcy court would not allow the Debtor to pay Mr. Westbury from the Debtor's assets, so she paid him from the VPS Transfers.[15]  Mrs. Westbury had no connection to VPS and knew she was not owed money from VPS.  Mrs. Westbury knew or should have known she had no reason to receive funds from VPS.  The court will enter judgment against Mrs. Westbury for $6,750.02.

Further, both the evidence at trial and the facts in the main bankruptcy case established that Mr. Westbury was a consultant to General Blunt, not the Debtor. Therefore, when Ms. Bowers transferred the funds to Mrs. Westbury in order to pay Mr. Westbury, she was satisfying General Blunt's obligation to pay the consulting fees to Mr. Westbury.  Therefore, General Blunt was the "entity for whose benefit such transfer was made" under §550(a)(1).  The court will also enter judgment against General Blunt and Vivian Bowers, jointly and severally, for $6,750.02 based on the VPS Transfers made by Ms. Bowers to Mrs. Westbury that satisfied General Blunt's obligation to Mr. Westbury.

Finally, the evidence established that some of the VPS Transfers made by Ms. Bowers from VPS to her personal checking accounts were used to make payments to Jemal's Ikon under the Jemal Settlement.  General Blunt was the "entity for whose benefit such [transfers were] made" under §550(a)(1) because he was obligated to the Jemal Parties under the Jemal Settlement and the payments were applied toward that obligation.  General Blunt's liability for these transfers will be discussed in greater length in "Jemal's Post-Petition Transfers" below.

---

[15] *See,* ECF 29 "Ordered, that the Cash Collateral may not be used to make any payments or any transfers to Eric Westbury…"  in Case No. 16-24661.

Here, the court concludes that Ms. Bowers is jointly liable with General Blunt for the "Jemal's Post-Petition Transfers."

**The Talisman Transfers**

The Trustee seeks to verify the Talisman Transfers were previously avoided under §549, and to recover the value of the Talisman Transfers from General Blunt and/or Ms. Bowers as transferees under §550.  For the reasons that follow, the court will enter judgment in favor of the Trustee against Ms. Bowers in the amount of $76,400, and jointly against General Blunt in the amount of $31,500.

The Talisman Transfers have already been avoided.  The complaint named Holdings as a defendant and sought to avoid the Talisman Transfers.  Holdings failed to answer, and the court entered final judgment against Holdings for $77,229, avoiding the Talisman Transfers under §549 and finding that Holdings was the initial transferee under §550(a)(1).  ECF 57 at 2.  At that time, both General Blunt and Ms. Bowers were parties to this action.

Aside from the Holdings' default, there is no doubt that the Talisman Transfers were avoidable transfers under the Bankruptcy Code.  The funds being returned to the Debtor by Talisman were funds the Debtor paid to apply for the bond.  Once Talisman denied the application, the Debtor, and only the Debtor, was entitled to receive the refund, which was property of the estate.  Mr. Westbury, acting on behalf of General Blunt and at the instruction of Ms. Bowers, diverted the Talisman Transfers outside the reach of the Debtor.  *See,* FF ¶¶21-24. The Talisman Transfers were a post-petition transfer of estate property made without authority under the Bankruptcy Code or approval of the court.  Indeed, the actions of Mr. Westbury and Ms. Bowers were intentionally designed to divert funds away from the Debtor.

28

As explained above, §550(a)(1) and (2) allow the Trustee to recover from (1) the initial transferee of the transfer or the entity for whose benefit the transfer was made; or (2) any immediate or mediate transferee of the initial transferee. The Trustee can recover from any combination of these entities subject to the limitation of a single satisfaction. 5 Collier on Bankruptcy P. 550.02[4] (16th 2020).

The Trustee's judgment against Holdings has proved to be of no economic value. Holdings was a shell company that had no operation and was created by Ms. Bowers to do little more than receive the unauthorized Talisman Transfers into its bank account. Other than some *de minis* amounts in its bank account, the only property of value held by Holdings were the Talisman Transfers. Those funds were disbursed by Ms. Bowers long before the Trustee brought suit. The court finds the Talisman Transfers to be recoverable under §550(a) from Ms. Bowers and General Blunt as follows.

After the Talisman Transfers were transferred into the Holdings' bank account, Ms. Bowers made the following disbursements:

| Date | Description | Amount |
|---|---|---|
| December 14, 2016 | Cash withdrawal at branch | $2,400.00 |
| December 15, 2016 | Cash withdrawal at branch | $27,000.00 |
| December 15, 2016 | Wire transfer to A. Hugo Bowers Suntrust account | $31,500.00 |
| December 23, 2016 | Cash withdrawal at branch | $5,000.00 |
| December 29, 2016 | Cash withdrawal at branch | $8,000.00 |
| January 4, 2017 | Cash withdrawal at branch | $2,000.00 |
| January 6, 2017 | Cash withdrawal at branch | $500.00 |

The court will first address the six cash withdrawals before addressing the $31,500.00 wire

transfer to A. Hugo Bowers.

Ms. Bowers instructed Mr. Westbury to have the Talisman Transfers sent to the Holdings' bank account. She was solely responsible for the disposition of the funds from the Holdings account, exercising complete dominion and control over them. Additionally, Ms. Bowers made all six of the cash withdrawals totaling $44,900. She testified she could not recall specifically what she did with the funds, but she acknowledged receiving the cash from the bank and disposing of the funds as she saw fit. Ms. Bowers was the mediate transferee of the cash withdrawals under §550(a)(2). For the same reasons described in connection with the VPS Transfers, Ms. Bowers is not entitled to the good faith defense of §550(a)(2). The Trustee is entitled to a judgment in the amount of $44,900 against Ms. Bowers for the six cash withdrawals she made of the Talisman Transfers.

Ms. Bowers also made the $31,500.00 wire transfer on December 15, 2016 to A. Hugo Bowers from the Holdings' account. A. Hugo Bowers is Ms. Bowers' brother. Post-petition, in November 2016, Ms. Bowers and General Blunt executed a promissory note in favor of A. Hugo Bowers in the amount of $46,500. PX 1 at p. 8-9. General Blunt signed the note personally, on behalf of the Debtor, and as a guarantor. Ms. Bowers signed the note as guarantor. Although General Blunt signed the note on behalf of the Debtor, the borrowing was an unauthorized post-petition loan under §364(b) because no notice was given of the loan and the court did not approve it. Further, the Debtor's records did not reflect a loan from A. Hugo Bowers, the bank statements did not reflect that this amount was deposited into any of the Debtor's bank accounts, and the Debtor's monthly operating report did not disclose the borrowing.

The $31,500 transfer on December 15, 2016 to A. Hugo Bowers by Ms. Bowers was purportedly in repayment of the loan. The transfer was a post-petition transfer of estate property

that was not authorized by the Bankruptcy Code or an order of the court.  Indeed, the cash collateral orders allowed the payments of only very specific obligations and expenses, and the repayment of the purported loan from A. Hugo Bowers was not authorized.  The transfer is therefore avoided under §549.  Further, because the transfer satisfied their obligations under the promissory note, the transfer to A. Hugo Bowers was for the benefit of General Blunt and Ms. Bowers and recoverable from them pursuant to §550(a)(1).  The Trustee is entitled to judgment against each of General Blunt and Ms. Bowers in the amount of $31,500 based on the transfer from Ms. Bowers to A. Hugo Bowers on December 15, 2016.

Of the Talisman funds, at least $27,000.00 was filtered through the VPS bank account to various defendants.  The Talisman Transfers occurred on December 13, 2016 and December 14, 2016.  On December 15,  2016, $27,000.00 cash was withdrawn from the Holdings account and deposited into the VPS  bank account.  The same day, a wire transfer from VPS to Mrs. Westbury occurred in the amount of $3,800.00.  According to Ms. Bowers' testimony, any checks written to Mrs. Westbury were solely for the services of Mr. Westbury.  Payments were made to Mrs. Westbury at the direction of Mr. Westbury, who did not maintain his own bank account. Specifically, Ms. Bowers testified that because the Debtor was in bankruptcy and could not pay Mr. Westbury itself[16], she paid him from the VPS account instead.  Ms. Bowers further acknowledged that she was aware the U.S. Trustee objected to Mr. Westbury's being on the Debtor's payroll from the start of the bankruptcy case and as a result, he was a consultant to General Blunt personally, and not an employee of the Debtor.  The $3,800.00 transfer to Mrs.

---

[16] See, ECF 29 "Ordered, that the Cash Collateral may not be used to make any payments or any transfers to Eric Westbury…"

Westbury was for the benefit of General Blunt because it satisfied his obligation to pay Mr. Westbury, his personal consultant.

In addition, following the $27,000 deposit into the VPS account, a cash withdrawal of $7,851.67 was made from the account on December 15, 2016 and a Wells Fargo cashier's check was purchased in the amount of $7,221.67, payable to the Jemal Parties. The Debtor's books and records do not reflect a payment to the Jemal Parties. This was a transfer made on behalf of and for the benefit of General Blunt on account of his personal guaranty to the Jemal Parties and constitutes one of the Jemal's Post-Petition. This is discussed further in Jemal Post-Petition Transfers.

At trial, Ms. Bowers testified she was aware that the Debtor was the entity entitled to the refund of the Talisman Transfers, and that she was functioning in the capacity of an officer of the Debtor at the time of the Talisman Transfers. The evidence shows that the Talisman Transfers were not authorized by this court and the subsequent disbursement of those funds was not authorized by the prevailing cash collateral orders at the time or any court order. Through her testimony, Ms. Bowers was unable to account for the use and dissipation of these funds. Both Ms. Bowers and Mr. Westbury were involved in the transfer of funds from Talisman to Holdings, as was General Blunt given his position with Holdings. As a result, none of the parties has a defense under §550(b).

In summary, the court is awarding judgment in favor of the Trustee and against General Blunt and Ms. Bowers, jointly and severally, in the amount of $31,500.00 for the A. Hugo Bowers transfer out of the Talisman Transfers made for their benefit; a judgment against Mrs. Westbury in the amount of $3,800.00 from the Talisman Transfers made to her, along with a judgment against General Blunt for that amount as the entity on whose behalf the transfer was made; and a

judgment against Ms. Bowers for $76,400 from the Talisman Transfers made to her via Holdings and/or for her benefit (inclusive of the $31,500 transfer to A. Hugo Bowers).

**The Jemal Pre-Petition Transfers**

The Trustee seeks to avoid and recover from General Blunt under §547 and §550 pre-petition transfers in the amount of $51,060.71 made by the Debtor to Jemal's Ikon in the one-year period prior to the Petition Date. The court agrees the transfers are avoidable preferences under §547 and are recoverable from General Blunt under §550 and will enter judgment in that amount in favor of the Trustee against General Blunt.

At the time of trial §547 provided

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made--
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
    (5) that enables such creditor to receive more than such creditor would receive if--
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. §547. [17]

---

[17] §547(b) was amended, effective February 19, 2020, to read as follows:

Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—

As established in the Findings of Fact, the Jemal Parties sued the Debtor in January 2015 seeking a judgment for the unpaid rent on the Oxon Hill and Mellwood leases.  At the time, Debtor was deeply in default on the leases.  *See,* FF ¶¶15-18.  *See also,* PX 113.   The Debtor, General Blunt, Jonathan Blunt and the Jemal Parties entered the Jemal Settlement.  PX 113. There, the Debtor, General Blunt and Jonathan Blunt agreed to pay the Jemal Parties $525,000 to settle all claims under the leases, payable in 72 monthly payments of $7,291.67.  *Id.* at ¶2.  The Jemal Settlement also gave the Jemal Parties a consent judgment against the Debtor, General Blunt, and Jonathan Blunt for all amounts owed under the Oxon Hill Lease, and provided that if the settlement was paid, the consent judgment would be marked paid and satisfied.

At the time of the Jemal Settlement, the Debtor owed $544,403.52 to Jemal's Ikon in back rent under the Oxon Hill Lease.  *Id.*  General Blunt had guaranteed the Debtor's obligations under the Oxon Hill Lease and therefore was obligated to Jemal's Ikon for that amount.  *See*, PX 113 at p.1.

The Debtor made the following pre-petition payments to Jemal's Ikon prior to and under the Jemal Settlement:

| Amount | Payee | Date |
|---|---|---|
| $7,291.67 | Jemal's Ikon | April 8, 2016 |
| $3,645.84 | Jemal's Ikon | April 21, 2016 |
| $3,645.83 | Jemal's Ikon | May 4, 2016 |

---

Whether or not the amended language of the statute applies in this case, the court has taken it into consideration as more fully described herein.

| $3,645.84 | Jemal's Ikon | May 24, 2016 |
|---|---|---|
| $3,654.84 | Jemal's Ikon | June 6, 2016 |
| $3,645.84 | Jemal's Ikon | June 30, 2016 |
| $3,645.84 | Jemal's Ikon | July 14, 2016 |
| $7,291.67 | Jemal's Ikon | August 10, 2016 |
| $7,291.67 | Jemal's Ikon | September 12, 2016 |
| $7,301.67 | Jemal's Ikon | October 10, 2016 |
| **$51,060.71** | **TOTAL** | |

General Blunt's guaranty of the Oxon Hill Lease and Jemal Settlement obligations provides the basis for the Trustee's recovery from him under §547. Although General Blunt is not a creditor of the Debtor in the traditional sense, by guaranteeing the Oxon Hill Lease and the Jemal Settlement he had a contingent right to payment from the Debtor in the event Debtor did not pay. As a result, under §101(5), General Blunt holds a "claim" and is therefore a "creditor" pursuant to §101(10). *See*, *Levit v. Ingersoll Rand Financial Corp*., 874 F.2d 1186 (7th Cir. 1989). Therefore, the pre-petition payments to Jemal's Ikon meet all the elements of recoverable preferences under §547(b) from General Blunt. The payments were transfers of property of the Debtor made for the benefit of a creditor, General Blunt. §547(b)(1). They were made on account of an antecedent debt because they were made toward General Blunt's obligations under his guaranty of the Oxon Hill Lease and the Jemal Settlement. §547(b)(2). The payments were made while the Debtor was insolvent, as established by Mr. Rueblemann. §547(b)(3). Further, General Blunt, as the Chairman and majority owner, was a statutory insider of the Debtor under §101(31)(B). By virtue of his status as an insider, any payments made within one year before the

date of the filing of the petition are avoidable.  §547(b)(4).  Finally, as established by the evidence at trial, general unsecured creditors will not receive much, if any, distribution from the Debtor, and therefore the payments allowed General Blunt to receive more than he would receive in a Chapter 7 case of the Debtor.  §547(b)(5).

General Blunt has not raised any of the preference defenses under §547(c).  Because he is not represented, the court has considered whether any defense applies.  None of them do.  There was no contemporaneous exchange of new value for the payments, §547(c)(1), and, after receiving the benefit of the payments, General Blunt gave no new value to the Debtor, §547(c)(4).  The Jemal's Pre-Petition Transfers were made on account of the Oxon Hill Lease and/or Jemal Settlement and not in accordance with ordinary business terms.  The Debtor was behind more than $500,000 in past due rent at the time each of the payments were made, and five of the payments were made after the Jemal Settlement.  The Jemal Settlement payments were not "in payment of a debt incurred by the [Debtor] in the ordinary course of business" because they were made toward the settlement of a large past due obligation.  §547(c)(2).  The Jemal Pre-Petition Transfers are avoided pursuant to §547.

Once a transfer is avoided under §547, the court turns to §550 to determine from whom the transfer, or the value of the transfer, is recoverable.  It is indisputable that General Blunt benefitted from the Jemal Pre-Petition Transfers on account of his personal guaranty of the obligations.  "When a debtor pays a creditor to satisfy a debt guaranteed by a third party, the creditor is the initial transferee and the guarantor, who is no longer liable for the debt, is the entity for whose benefit the transfer is made." *Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26, 29 (4th Cir. 1989) (citing *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir. 1988).  Pursuant to

§550(a)(1), the court will enter judgment in favor of the Trustee and against General Blunt in the amount of $51,060.71 on account of the Jemal Pre-Petition Transfers.

**The Jemal Post-Petition Transfers**

The payments to the Jemal Parties under the Jemal Settlement continued after the Petition Date. The Trustee seeks to avoid and recover from General Blunt and Ms. Bowers, under §549 and §550 post-petition transfers in the amount of $29,166.68 made from the Debtor's assets to the Jemal Parties. The court agrees the transfers are avoidable under §549 and recoverable from General Blunt and Ms. Bowers under §550, and will enter judgment in favor of the Trustee against General Blunt and Ms. Bowers in the amount of $29,166.68.

Section 549 provides, in relevant part:

(a) Except as provided in subsection (b) or (c)[18] of this section, the trustee may avoid a transfer of property of the estate--
        (1) that occurs after the commencement of the case; and
        (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
              (B) that is not authorized under this title or by the court.

Here, four post-petition payments were made to Jemal's Ikon totaling $29,166.68, PX 150, as follows:

- A payment dated November 18, 2016 in the amount of $7,291.67. The source of the payment was a $28,000.00 transfer by the Debtor to VPS on November 18, 2016, one of the VPS Transfers addressed above;

- A payment dated December 15, 2016 in the amount of $7,221.67. The source of the payment was a portion of the Talisman Transfers to Holdings of $27,000.00 on December 15, 2016, as addressed above;

---

[18] The exceptions in §549(b) and (c) do not apply to this case.

- A payment dated January 18, 2017 in the amount of $7,291.67. The source of the payment was a $25,000.00 transfer by the Debtor to VPS on January 18, 2017, one of the VPS Transfers addressed above;

- A payment dated February 24, 2017 in the amount of $7,291.67. The source of the payment was a transfer by the Debtor of $12,600.00 to VPS on February 24, 2017, one of the VPS Transfers addressed above.

PX 150.

Section 549 is intended to protect against the very transfers at issue here. There is simply no justification or authority under the Bankruptcy Code for paying the Debtor's pre-petition obligation under the Jemal Settlement after the Petition Date. By the Petition Date, the Debtor no longer had the right to use or occupy the offices that were the subject of either the Oxon Hill or Mellwood Leases. The Debtor's obligations under the Jemal Settlement was simply a pre-petition debt that, to the extent unpaid, allowed the Jemal Parties to share *pro rata* in whatever recovery would be available to all pre-petition unsecured creditors of the Debtor. The payments were not authorized under the cash collateral orders entered by the court, which prohibited the Debtor from making any payment not expressly allowed, nor were they authorized by any other order of the court. The Jemal post-petition transfers were avoided to the extent they were made from VPS Transfers, and were avoided to the extent they were Talisman Transfers.

Once a transfer is avoided under §549, a trustee may recover the property transferred, or the value of such property, from the parties identified in §550(a)(1) and (2). Among those parties is the "entity for whose benefit such transfer was made." §550(a)(1). General Blunt was the "entity for whose benefit such transfer was made." The source of the Jemal post-petition transfers was the Debtor's assets. The payments were made first from the Debtor to VPS or by diverting

the Debtor's funds from Talisman to Holdings, as described above, and then to the Jemal Parties from VPS or Holdings, or via Ms. Bowers, as the case may be. This scheme was orchestrated by Ms. Bowers and was intended to allow continued payment to the Jemal Parties in order to reduce General Blunt's obligation under the Settlement Agreement. The payments were made without authority of the court or the Bankruptcy Code and were intentionally hidden from the court and creditors by the subterfuge of first transferring funds to VPS or Holdings so that General Blunt's obligations to the Jemal Parties would be reduced by payments that would not have been allowed.

The Court will enter judgment in favor of the Trustee and against General Blunt and Ms. Bowers, jointly and severally, in the amount of $29,166.68 on account of the Jemal Post-petition Transfers. The judgment against Ms. Bowers is inclusive of judgments against her for the VPS Transfers and the Talisman Transfers and is subject to the single satisfaction rule.

**Victoria Westbury Transfers**

The Trustee seeks to recover from Mrs. Westbury under §549 and §550 post-petition transfers in the total amount of $10,550.02. The grounds for recovery from Mrs. Westbury were set forth above in the discussion concerning the VPS Transfers and Talisman Transfers and are summarized here for clarity. The avoidable transfers are:

| Issue Date | Payee | Account | Check # | Amount |
|---|---|---|---|---|
| 12/15/2016 | Victoria Westbury | VPS | Wire Transfer | $3,800.00 |
| 1/13/2017 | Victoria Westbury | VPS | #1041 | $1,500.00 |
| 2/10/2017 | Victoria Westbury | VPS | #1052 | $3,000.00 |
| 2/24/2017 | Victoria Westbury | VPS | #1058 | $1,500.0 |
| 2/23/2017 | Victoria Westbury | VPS | #1057 | $750.02 |

| | | | TOTAL | $10,550.02 |
|---|---|---|---|---|

PX 149.  The court concluded above that the transfers are avoidable under §549 and recoverable from Mrs. Westbury under §550(a)(2).  The court will enter judgment in favor of the Trustee against Mrs. Westbury in the amount of $10,550.02.

**Violations of the Automatic Stay**

The filing of a bankruptcy petition operates as a stay, as relevant here, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. §362(a)(3).  A party seeking to establish a violation of the automatic stay must establish, by a preponderance of the evidence, that: (1) the defendant knew of the existence of the stay; (2) the defendant performed an intentional action; and (3) the action violated the stay.  *See*, *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 302 (5th Cir. 2005); *In re Saunders*, 2014 WL 811734, *2 (Bankr. D.Md. Feb. 28, 2014); *In re Clayton*, 235 B.R. 801 (Bankr. M.D.N.C. 1998) (holding that the standard of proof is the preponderance of the evidence standard).

A violation of the automatic stay subjects the violating party to liability for damages, but only if the violation is willful.  §362(k)(1).  The Fourth Circuit Court of Appeals has stated that in the context of §362(k)(1), willfulness does not require the specific intent to violate the automatic stay, only that the defendant knew of the stay and intentionally committed an act in violation of the stay.  *Citizens Bank of Maryland v. Strumpf*, 37 F.3d 155, 159 (4th Cir.1994) *rev'd on other grounds*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995); *Budget Serv. Co. v. Better Homes*, 804 F.2d 289, 292–93 (4th Cir.1986).

In Count X, the Trustee alleges that General Blunt and Ms. Bowers violated the automatic stay by exercising dominion and control over property of the Debtor's estate when they conspired to divert the Talisman Transfers of $77,229.00 from the Debtor to Holdings. The Trustee maintains that because each of the defendants were aware of the bankruptcy filing, their violations were willful, and the estate has suffered damages as a result. The Trustee seeks punitive damages for the alleged stay violations.

Both General Blunt and Ms. Bowers violated the automatic stay by obtaining possession of and exercising control over the Talisman Transfers. Ms. Bowers did so directly, and General Blunt did so though his agent, Mr. Westbury, acting on his behalf, allowing General Blunt to realize the benefit of the funds. Ms. Bowers' testimony was clear; the transfers were made to get the funds away from the bankruptcy estate because they knew they would not be allowed to use the funds for the reasons they wanted to use them. Thus, the diversion was a blatant and intentional violation of the stay.

The court will award $25,000 punitive damages against Ms. Bowers and General Blunt for their willful violation of the stay. Their actions resulted in loss to the estate and caused the Trustee to expend considerable effort to recover the transfers. Further, the transfers were made for the express purpose of diverting funds from the estate. Punitive damages are appropriate.

### Conclusion

For the foregoing reasons, the Court finds as follows:

- o Transfers to General Blunt in the amount of $508,250.00 made in the three-year period prior to the petition date are avoidable pursuant to MUFCA §15-208(b)(1) and recoverable from him under §550, including the transfer in the amount of $125,000 that is also avoided under MUFCA §15-207;

- o The VPS Transfers were previously avoided by this court under §549, which finding was fully supported by the evidence at trial, and are recoverable from:
  - ▪ Vivian Bowers pursuant to §550(a)(2) in the amount of $58,401.36;
  - ▪ General Blunt, jointly and severally with Ms. Bowers, pursuant to §550(a)(1) in the amount of $6,750.02[19]; and
  - ▪ Victoria Westbury pursuant to §550(a)(2) in the amount of $6,750.02;
- o The Talisman Transfers were previously avoided by this court under §549, which finding was fully supported by the evidence at trial, and are recoverable from:
  - ▪ Vivian Bowers pursuant to §550(a)(1) in the amount of $76,400.00 (inclusive of the $31,500 below);
  - ▪ General Blunt and Vivian Bowers, jointly and severally, pursuant to §550(a)(1) in the amount of $31,500.00;
  - ▪ General Blunt and Vivian Bowers, jointly and severally, pursuant to §550(a)(1) in the amount of $3,800.00[20];
  - ▪ Victoria Westbury pursuant to §550(a)(2) in the amount of $3,800.00;
- o The Jemal Pre-Petition Transfers are avoidable preferences under §547 as to General Bunt and recoverable from him pursuant to §550(a)(1) in the amount of $51,060.71;

---

[19] The $6,750.02 recoverable from Ms. Bowers is also included in the $58,401.36 and subject to the single satisfaction rule.

[20] The $31,500 and $3,800 recoverable from Ms. Bowers are also included in the $76,400.00 and subject to the single satisfaction rule.

o The Jemal Post-Petition Transfers are avoidable under §549 and recoverable from General Blunt and Vivian Bowers, jointly and severally, pursuant to §550(a)(1) in the amount of $29,166.68[21];

o General Blunt and Vivian Bowers violated the automatic stay of §362 by obtaining possession of and exercising control over the Talisman Transfers and punitive damages are awarded in favor of the Trustee in the amount of $25,000.00.

Judgment will be entered consistent with this ruling.


cc:     Debtor-Essex Construction, LLC
        Debtor's Counsel- Richard S. Basile
        Plaintiff- Bradford Englander
        Plaintiff's Counsel – Nelson Cohen
        Defendant- Roger R. Blunt, Sr., *pro se*
        Defendant- Vivian W. Bowers, *pro se*
        Defendant- Victoria D. Westbury, *pro se*
        Defendant- A. Hugo Bowers
        Defendant's Counsel - S. Sadiq Gill
        U.S. Trustee


**END OF MEMORANDUM**

---

[21] The $29,166.68 recoverable from Ms. Bowers is also included in the avoidance and recovery of the VPS Transfers and the Talisman Transfers and subject to the single satisfaction rule.